IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DELAINA N. C.[1]                          )
                                          )
                    Plaintiff,            )
                                          )
vs.                                       )    Case No. 17-cv-00914-CJP[2]
                                          )
COMMISSIONER OF SOCIAL                    )
SECURITY,                                 )
                                          )
                    Defendant.            )

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Delaina N. C. (Plaintiff) seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB on August 12, 2013, alleging a disability onset date of June 3, 2013. (Tr. 181-87). Her application was denied at the initial level and again upon reconsideration. (Tr. 75, 89). Plaintiff requested an evidentiary hearing, which Administrative Law Judge (ALJ) Kevin R. Martin conducted in May 2016. (Tr. 37-74). ALJ Martin reached an unfavorable decision on August 17, 2016. (Tr. 15-36). The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final agency decision. (Tr. 1-6). Plaintiff

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect his privacy. See FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c). See Doc. 30.

exhausted her administrative remedies and filed a timely Complaint with this Court. (Doc. 1).

## Issues Raised by Plaintiff

Plaintiff argues the ALJ erred in assessing the medical opinions of record and her allegations of the severity of her symptoms. She also asserts the ALJ's residual functional capacity assessment was not supported by substantial evidence.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled, which means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner

at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of

the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The ALJ's Decision

The ALJ applied the five-step analytical framework set forth above.  He determined Plaintiff met the insured status requirements through December 31, 2018 and had not engaged in substantial gainful activity since June 7, 2013.  (Tr. 20).  Plaintiff had severe impairments of degenerative disc disease status post surgeries, fibromyalgia, chronic pain syndrome, anxiety, and depression.  (Tr. 21).  She had the RFC to perform sedentary work with several additional limitations, which precluded her from performing any past relevant work.  (Tr. 24, 29).  However, there were other jobs in the national economy Plaintiff could perform, so she was not disabled.  (Tr. 29-30).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to the points raised by Plaintiff.

### 1.  Agency Forms

In her agency forms, Plaintiff alleged that spinal stenosis, degenerative disc disease, a lumbar fusion, failed back surgery syndrome, anxiety, depression, a leg

length discrepancy, insomnia, GERD, and severe back pain limited her ability to work. (Tr. 202).

Plaintiff completed a function report in March 2014 and stated she was unable to stand for more than 10 to 15 minutes at a time without severe pain in her back and right leg. She could not sit in a chair for more than 30 minutes without pain. Plaintiff could not bend, twist, stoop, squat, or kneel excessively. She could not lift more than 20 pounds. Plaintiff could walk for about 20 to 30 minutes and could sometimes tolerate walking for up to an hour. (Tr. 216, 221). On an average day, Plaintiff woke up, made her bed, let her dogs outside, sat on the couch and drank coffee, showered, and then sat in a chair to finish getting ready. Showering caused her pain. After getting ready, she drove herself to physical therapy for an hour. (Tr. 217). She sometimes ran errands after physical therapy if she was not in pain. She usually had to lie down for an hour to rest her back after getting home. After resting, Plaintiff emptied the dishwasher and picked up around the house. She helped fix supper and fed her dogs. (Tr. 223).

Plaintiff was able to feed and water her dogs and let them outside. Her spouse shared these responsibilities with her. She could also prepare complete meals with several courses on a daily basis. She had to sit on a stool to do most of her cooking and her husband helped. Plaintiff did laundry, washed dishes, went grocery shopping, and dusted on a weekly basis. Plaintiff needed help with groceries and dusting on occasion. Sometimes, Plaintiff was in too much pain to

fall asleep. She could not drive more than 30 miles due to pain. Plaintiff's hobbies included reading, crafting, traveling, and antiquing. She could "do all of them well." However, she could not craft as much as she used to because she could not sit for long periods. Her ability to travel and antique was also limited because she could not ride in a car or walk for long periods. (Tr. 217-20).

Plaintiff's husband, Daniel, completed a third party function report, which corroborated Plaintiff's alleged limitations. He also stated Plaintiff and he were no longer able to have date nights because of Plaintiff's pain. Overall, they spent less time as a family because of her conditions. (Tr. 230-37).

Plaintiff completed an additional function report in May 2014. She stated she had to have a chair in her shower because she could not wash her hair or body, or shave without extreme pain. She also used a chair to cook, wash dishes, and get ready because she could not stand long enough to complete these activities without pain. Her husband helped her grocery shop because she could not carry or load bags. Her husband also drove her anywhere that was more than 10 minutes away. Plaintiff's daily chores were "very light duty with several breaks every 15-20 minutes" where she had to lay flat for 10-15 minutes at a time. (Tr. 253, 261).

### 2. Medical Records

Dr. Evan Belfer was Plaintiff's primary care physician from February 23, 2009 until March 30, 2016. The record reflects that Plaintiff saw Dr. Belfer on over 20 occasions from March 2012 to May 2016. Dr. Belfer's notes are

handwritten and often illegible. However, it appears Plaintiff frequently complained of back and muscle pain, difficulty sleeping, and depression. Dr. Belfer assessed Plaintiff with lower back pain, insomnia, hypothyroidism, myalgia, and depression. He prescribed a variety of medications at different points, including Wellbutrin, Topiramate, Temazepam, Cyclobenzaprine, Ativan, Cymbalta, Depakote, and Flexeril. (Tr. 603-13, 931-34,965-76).

On February 15, 2013, Plaintiff began seeing Dr. Joel Ray, a neurosurgeon, for back and leg pain. At the initial consultation, she stated she was able to get into positions that offered almost complete relief, but those positions were not functional with bending her knees, bending her back to open up the spine, or lying down. As soon as she stood for any period, she had excruciating leg pain and increased back pain. Dr. Ray noted that Plaintiff continued to work and was "apparently tolerating that." She tolerated her work environment but felt her life was very dysfunctional due to her pain. On physical examination, Plaintiff demonstrated leg and back pain while standing. A straight leg raise was positive on the right at about 30 degrees, with a mild increase in her right leg pain. Resistive motor testing was 5/5 and equal and there was some slight decrease to external rotation of the right foot and minimal decrease of the great toe. Her reflexes were +2/4 and equal bilaterally with a slightly increased ankle jerk on the right. Dr. Ray referred Plaintiff for electrical studies and a pain management consultation and scheduled MRIs and CAT scans. He also recommended an aquatics therapy program and told her to consider a dorsal column stimulator

(DCS) and a right L5-S1 transforaminal lumbar interbody fusion (TLIF). (Tr. 759-62).

On March 30, 2013, a lumbar spine MRI demonstrated a stable small broad-based left L4-5 lateral disc protrusion and enhancing annular tear. (Tr. 868). A CT of the lumbar spine showed L5-S1 disc osteophyte complex within the right foraminal/lateral extraforaminal location, which appeared to be abutting the exiting nerve root and causing at least moderate to severe right neural foraminal narrowing. (Tr. 867).

Dr. Mark Kinder performed a pre-surgical psychological diagnostic interview of Plaintiff on April 25, 2013. Dr. Kinder noted the following "Caution Factors": disrupted sleep, potential tendency to isolate and withdraw, possible inconsistency in her cooperation with a prolonged rehabilitation program, and high levels of depression and anxiety. Dr. Kinder diagnosed her with pain disorder, associated with both psychological factors and medical conditions; anxiety disorder; depressive disorder; rule out posttraumatic stress disorder; and rule out insomnia. He opined that no factors indicated she would be an unsuitable candidate for surgery. Dr. Kinder recommended Plaintiff re-start counseling and more aggressively pursue treatment for her emotional symptoms. Plaintiff stated that her pain that month was a 10/10 at its most severe and a 0/10 at its least severe. She stated that a heating pad, a bath, lying down, and weekends she does not work contributed to less pain. Sitting, being around family, frustration, muscle tension, and standing exacerbated her pain. She

denied self-care deficits and was working over 40 hours a week at the time of the evaluation. She had some difficulty showering because of the need to stand but was able to perform household chores. She complained of a lack of energy and fatigue. She could drive limited distances and her leisure activities included watching television, reading, and spending time with her dogs. (Tr. 851-54).

Plaintiff presented to Dr. Carmen Keith on April 25, 2013. She reported right hip pain, right leg pain, right lower back pain, and a numbness and tingling sensation in the lower back. Her pain level was a 5/10. When lying down, her pain was minimal. It worsened with standing. She was able to stand 5 minutes before pain became excruciating. Plaintiff stated that aqua therapy helped some. Dr. Keith noted that Plaintiff had a lumbar facet injection, which helped minimally. Plaintiff demonstrated a slowed gait and was positive for tenderness and Faber and compression signs on the right sacroiliac. She was positive for numbness in the right lower extremity. Dr. Keith opined Plaintiff had a likely component of sacroiliac involvement on the right side and S1 radiculopathy. She administered a right S1 transforaminal injection and a diagnostic right sacroiliac block to further determine the role of her pain. She suggested trying DCS if the injection and therapy did not help. (Tr. 862-66).

Plaintiff followed-up with Dr. Ray on May 8, 2013. He reviewed her MRI of the lumbar spine and opined it showed Modic changes at L5-S1, suggesting edema within the endplates of L5-S1, and a fragment protruding posteriorly out of the disc. He also opined that Plaintiff sat as if there was ongoing compression.

Dr. Ray stated that Plaintiff had failed extensive surgical and nonsurgical management, and it appeared she had an active right S1 radiculopathy. He noted that Plaintiff was "miserable." (Tr. 763-64).

Plaintiff saw Dr. Belfer on May 23, 2013. He assessed her with lower back pain, depression, and anxiety, and prescribed Cymbalta. (Tr. 604).

Plaintiff returned to Dr. Keith on June 4, 2013. Plaintiff stated that the right nerve block did not help her pain. According to Dr. Keith, this suggested Plaintiff had radiculopathy and lumbar post laminectomy syndrome with neuropathic pain. Dr. Keith assessed Plaintiff with right hip pain, right leg pain, right lower back pain, paresthesia, radicular syndrome of the lower limbs, and postlaminectomy syndrome of the lumbar region. She again discussed DCS with Plaintiff and opined further injections would not be beneficial. Dr. Keith refilled Plaintiff's hydrocodone and Flexeril and referred her back to Dr. Ray with consideration of surgical intervention. (Tr. 848-50).

Plaintiff saw Dr. Ray on June 4, 2013 and they agreed to go forward with a right L5-S1 TLIF. (Tr. 765-66). Plaintiff underwent the surgery on July 9, 2013. (Tr. 769-72).

Plaintiff followed-up with Dr. Ray on July 24, 2013. She stated she was pain-free and doing "extremely well" following the surgery. Dr. Ray opined Plaintiff could initiate simple physical therapy but no active range of motion to her low back. (Tr. 773-74).

Plaintiff saw Dr. Kinder on August 12, 2013. She reported good results from the back surgery with little or no pain. (Tr. 825).

Plaintiff saw Dr. Andrew Walker, a pain specialist, on August 21, 2013. She complained of right foot pain that worsened with standing. Plaintiff maintained that the steroid injections from April 25, 2013 resulted in no improvement. On examination, Plaintiff had an antalgic gait and was positive for tender points in her lower back. Dr. Walker assessed Plaintiff with radicular syndrome of the lower limbs and right leg pain. He prescribed her Topiramate and administered a lumbar selective nerve root block in the right L5/S1. (Tr. 814-19).

Plaintiff received a CT of her lumbar spine on August 21, 2013. The images showed S-shaped curvature of the thoracolumbar spine with no spondylolisthesis. There was also residual discogenic and degenerative joint disease of the lumbar spine. Above the level of the fusion at L4-L5, there was mild circumferential disc bulge eccentric to the left with moderate left L4-L5 foraminal stenosis. (Tr. 823-24).

Plaintiff followed-up with Dr. Ray on August 21, 2013. She was doing "great" until the previous Friday when she engaged in more activity than usual. All of her symptoms recurred. Dr. Ray opined her pain was "an inflamed irritation of her feeling so much better and then probably moving forward too quickly with activities." He noted Plaintiff was "fusing nicely" and had no

instrument failure. Dr. Ray stated she was doing much better than before surgery but was set back by her activities. (Tr. 711-12).

Plaintiff saw Dr. Belfer in August 2013 and said she was starting to have pain down her leg. (Tr. 603).

Plaintiff followed up with Dr. Kinder on August 26, 2013. She reported worsening pain related to standing. She said the injection from Dr. Walker on August 21, 2013 "did little for her." (Tr. 826).

Plaintiff followed-up with Dr. Walker on September 12, 2013 and complained of right foot pain that worsened with standing. On examination, Plaintiff had an antalgic gait and was positive for tender points in her lower back. Dr. Walker assessed Plaintiff with right leg pain and radicular syndrome of the lower limbs. He refilled her Topiramate and administered a lumbar selective nerve root block. (Tr. 820-22).

Plaintiff returned to Dr. Walker on September 16, 2013 for pain in her right foot, right leg, and right lower back. On examination, Plaintiff had an antalgic gait and was positive for tender points in her lower back. Dr. Walker assessed Plaintiff with right leg pain, right lower back pain, liotibial band friction syndrome, postlaminectomy syndrome of the lumbar region, and radicular syndrome of the lower limbs. He prescribed Plaintiff Mobic. (Tr. 811-13).

Plaintiff saw Dr. Ray on October 2, 2013. He stated Plaintiff was vacillating in her symptoms. Although she was not in nearly as much pain as she was prior to surgery, she was not at a satisfactory level. Plaintiff said she was not improving

or doing the things she wanted in life. She had periods of pain that were intractable. A CT scan showed good signs of decompression and fusion. Dr. Ray wanted to work with Plaintiff's pain management team to ensure all of the pain generators had been identified. (Tr. 776-77). Dr. Ray authored a letter stating Plaintiff required an extensive recovery period following her surgery. She had to wear a back brace at all times when standing or sitting upright, could not put on her own socks or shoes without direct assistance, and at times required assistance with other clothing. She could only shower with the assistance of handrails and a shower chair and could only shower when someone was home in case she needed help. Plaintiff also needed assistance transferring from the bed, and onto and off the commode. Plaintiff could not perform household chores such as laundry, cleaning, grocery shopping, or cooking. Dr. Ray instructed Plaintiff not to bend, twist, turn at the waist, lift more than 10 pounds, drive, or sit for more than 20 minutes at a time without changing positions. Dr. Ray instructed Plaintiff to spend most of the time lying down. Her pain medications also impaired her activities. Dr. Ray stated her recovery would take at least three to six months from the time of the TLIF. (Tr. 775).

A CT of Plaintiff's lumbar spine from October 2, 2013 showed mild spondylosis at L4-L5 with minimal left neural foramina stenosis. There were postsurgical changes and scarring on the right at L5-S1, making evaluation of the L5 nerve root difficult. (Tr. 810).

Plaintiff saw Dr. Belfer on October 9, 2013. She said she really wanted to get back to work but her back issues were not improving even after surgery. (Tr. 602).

Plaintiff followed-up with Dr. Keith on November 8, 2013 for myofascial pain syndrome. She reported pain in her right foot that worsened with standing. Her muscle testing was 4/5 in the bilateral back at L4 and L5. She had tender points in the lumbar, bilaterally. Dr. Keith noted that Plaintiff's previous S1 block did not help her pain. Her back pain was much improved following surgery with Dr. Ray. She had residual lumbar pain with palpable trigger points. Dr. Keith administered trigger point injections and suggested a trial of topical pain cream. (Tr. 805-09).

Plaintiff saw Dr. Ray on November 13, 2013. Plaintiff said she had been improving and wanted a more aggressive program so she could return to work. (Tr. 706-07).

Plaintiff followed-up with Dr. Belfer on November 14, 2013 and said her depression medication was not working. Plaintiff also said her back issues had not improved enough for her to return to work and she was experiencing multi-joint pain. (Tr. 602).

Plaintiff followed-up with Dr. Ray on December 20, 2013. He noted Plaintiff had not done well following her November 2013 visit. Her pain returned to the right leg and Dr. Ray "truly [saw] an unlikely return" to work. He ordered a CT

scan and discussed a specific therapy plan that would help neuropathic pain and the type of injury and surgery Plaintiff had had. (Tr. 704-05).

On January 9, 2014, Plaintiff presented to Dr. Belfer with difficulty sleeping. Dr. Belfer assessed her with insomnia, depression, and lower back pain. (Tr. 600).

Plaintiff saw psychologist Dr. Stephen Jordan on January 16, 2014. Plaintiff noted improvement from physical therapy. She also stated that the TLIF surgery relieved the pain in her legs, but not in her right low back. She was limited to 10 minutes of standing and could drive short distances. Injections from Dr. Keith had not been helpful but the topical pain cream offered relief. Plaintiff was apparently not taking her medications as prescribed. Dr. Jordan instructed her to take her medications, continue physical therapy, and follow-up in three to five weeks. (Tr. 798-801).

Plaintiff saw Dr. Keith on January 17, 2014. She reported right lower back pain. On examination, she demonstrated tender points in her lumbar, bilaterally. Her muscle testing was 4/5 in the bilateral back at L4 and L5. Plaintiff indicated her leg was much improved after surgery. The injections from her most recent visit helped only minimally. The topical pain cream helped her pain and she was improving with physical therapy. Dr. Keith recommended she continue therapy and refilled her hydrocodone. (Tr. 793-97).

Plaintiff followed-up with Dr. Jordan on February 6, 2014. She said she went a full week without any pain and was seeing a correlation between her stress

levels and back pain. Physical therapy was "clearly helping." She did not want to proceed with DCS at that time. (Tr. 803-04).

Plaintiff saw Dr. Ray on February 13, 2014. She stated she believed her symptoms improved enough that she might be able to adopt a child. Since Plaintiff showed improvement, Dr. Ray suggested physical therapy. (Tr. 702-03).

A CT of Plaintiff's lumbar spine from February 13, 2014 showed dextrocurvature; no spondylolisthesis; no acute compression fracture; changes of an attempted posterior column discectomy and fusion procedure at L5-S1; intact instrumentation; no bridging bone incorporation; right hemilaminectomy change; right L5-S1 facetectomies/foraminotomy; generalized bony spinal canal narrowing, which may have been congenital; mild intervertebral disc space narrowing at L40L5 with minimal circumferential disc bulge eccentric to the left; mild left L4-L5 foraminal stenosis; loss of the right L5S1 foraminal fat, which contacts the exiting the L5 nerve root; and unchanged prominent retroperitoneal lymph nodes. (Tr. 791-92).

Plaintiff saw Dr. Keith on February 25, 2014 and said she had pain in her lower right lumbar spine, right leg, and right foot. The pain worsened with standing and she could not find anything to relieve the pain, including medication. She stated she experienced minimal help from the trigger point injections but her leg was much improved following the TLIF. On examination, Plaintiff demonstrated tender points in the lumbar, bilaterally. During muscle testing,

Plaintiff was 4/5 in the bilateral back at L4 and L5. She received a sacroiliac joint injection and was instructed to follow-up in a month. (Tr. 783-86).

Plaintiff followed-up with Dr. Keith on March 25, 2014 and reported pain in her lower, right lumbar spine, lower, right sacroiliac area, right leg, and right foot that worsened with standing. Examination revealed tender points in the right lumbar. Plaintiff stated the sacroiliac joint injection from February 2014 resulted in 90% improvement until recently, when she reported having some days where she could tell it was only helping to alleviate the pain about 50%. She continued to report the need for pain medication but only took two pills at a time and only when she really needed them. Dr. Keith refilled her prescriptions for Mobic and hydrocodone. (Tr. 919-923).

Plaintiff presented to Dr. Keith on April 25, 2014. She had pain in her sacroiliac region, lower, right lumbar spine, right leg, and right foot that worsened with standing. She said the injection from February 2014 helped her pain significantly for 1.5 months. She was able to decrease the amount of pain medication she was taking during that time. Plaintiff received another sacroiliac joint injection. (Tr. 911-15).

Plaintiff saw Dr. Jordan on June 4, 2014. She stated she had essentially full relief from low back pain following her first injection, which lasted about two months. The second injection lasted about three weeks. She had had a recurrence of significant pain. (Tr. 909).

Plaintiff followed-up with Dr. Ray on June 4, 2014. A CT scan showed excellent signs of fusion. Dr. Ray noted, "Dr. Keith and Dr. Jordan are working with the patient who is just simply not able to go forward with a return to work status. I think at this point she either is going to adapt to what she has with help of Dr. Keith and Dr. Jordan or she is going to reconsider the dorsal column stimulate." He also noted that she thought her limitations were "disabling for a return to work status." (Tr. 941-42).

Plaintiff saw Dr. Belfer on June 17, 2014 and reported left shoulder pain. He prescribed her Baclofen. (Tr. 932).

Plaintiff followed-up with Dr. Keith on July 1, 2014 for sacroiliac pain. She also reported pain in her lower, right lumbar spine, right leg, and right foot that worsened with standing. A CT of her lumbar spine showed a persistent S-shaped curvature of the thoracolumbar spine, unchanged and no spondylolisthesis. Residual discogenic and degenerative joint disease of the lumbar spine was also present. There was some interval progression of disease at L4-L5, just above the level of attempted fusion. On examination, Plaintiff was positive for tender points in the right sacroiliac. She was assessed with sacroilitis and received sacroiliac joint injections. Dr. Keith noted that her pain response to the injection varied. She was to return in two to three months for another injection. (Tr. 901-08).

Plaintiff followed-up with Dr. Keith on September 2, 2014 and reported sacroiliac pain. On examination, Plaintiff was positive for tender points in the

right sacroiliac. Dr. Keith assessed Plaintiff with sacroilitis and gave her a sacroiliac joint injection. (Tr. 894-900).

Plaintiff saw Dr. Keith on October 27, 2014. She had low back and sacroiliac pain. Her gait was normal and affected by a right limp. She had tender points present in her right sacroiliac. Plaintiff underwent lumbar radiofrequency lesioning/rhizotomy and Dr. Keith prescribed Baclofen. (Tr. 984-92).

Plaintiff consulted rheumatologist, Dr. Amjad Roumany, on February 24, 2015. Plaintiff said she experienced increasing muscle aches and cramps with pain in her joints, elbows, and hand, beginning about 1.5 years prior. On examination, Plaintiff showed no synovitis, limitation of motion, pain on motion, crepitation subluxation, or effusion of any joints in either the upper or lower extremities. She had diffuse myofascial tender points in her elbows, knees, rib area, trapezius, and lumbar spine. Dr. Roumany ordered blood tests for further evaluation. (Tr. 944-45).

Plaintiff saw Dr. Belfer on November 24, 2014 and reported pain, muscle cramps, and fatigue. (Tr. 976).

Plaintiff presented to Dr. Belfer on December 4, 2014. She reported worsening muscle pain. Dr. Belfer assessed Plaintiff with fatigue and myalgia and prescribed Cymbalta. (Tr. 975).

Plaintiff followed-up with Dr. Belfer on January 5, 2015 and reported sinus problems. (Tr. 975).

Plaintiff followed-up with Dr. Belfer on February 25, 2015 for a medication refill. (Tr. 974).

Plaintiff saw Dr. Kaith on December 2, 2015. She had pain in her right lower back. Her gait was normal with a right leg limp. Tender points were present in the right sacroiliac. Faber sign was positive on the right and Plaintiff was positive for thigh thrust and Gaenslen on the right. Plaintiff was negative for compression. Dr. Keith refilled her Baclofen and hydrocodone. Plaintiff also received a right sacroiliac joint injection. (Tr. 999-1005).

Plaintiff presented to Dr. Ray on December 9, 2015. She reported 75% to 90% improvement of her sacroiliac pain with injections, which lasted for a few weeks. On examination, she had point tenderness in the right sacroiliac region. Straight leg raise tests were negative. She had positive pain with provocative measures of the right SI joint. No pain was elicited with provocative measures of the right hip. Diagnostically, she appeared to have clinically moderate to severe right SI joint pain/dysfunction. Plaintiff wanted to move forward with a right SI joint fusion. She also needed physical therapy. After the fusion, Plaintiff would need to be partial weight bearing on the right side. (Tr. 939-940).

Plaintiff saw Dr. Belfer on January 11, 2016 for a medication refill. (Tr. 973).

Plaintiff saw Dr. Roumany on March 8, 2016 and reported increasing discomfort and pain in her hands and shoulders. She did not sleep well and had been taking pain medication with some improvement. On examination, she

demonstrated 5/5 muscle strength and normal range of motion in all major muscle groups and no pain with range of motion. Myofascial tender points were present in the elbows, knees, trapezius, ribs, and cervical and lumbar spine. Dr. Roumany assessed Plaintiff with joint pain and fibromyalgia. He instructed Plaintiff to continue therapy and aquatic exercises and consider Cymbalta in the future. (Tr. 946-49).

Plaintiff saw Dr. Keith on March 15, 2016. She said she had right lower back pain, radiating to her right leg. On examination, Plaintiff demonstrated a normal gait, affected by a right leg limp. She had tender points in the right sacroiliac. Faber sign was positive on the right. She had a positive thigh thrust and Gaenslen on the right and negative compression. Dr. Keith assessed Plaintiff with chronic pain syndrome, lumbar radiculopathy, and sacroilitis. He refilled her hydrocodone. (Tr. 957-62).

Plaintiff followed-up with Dr. Belfer on March 9, 2016 and said she felt overwhelmed. Dr. Belfer assessed Plaintiff with fibromyalgia, insomnia, and anger. He prescribed Depakote and Cymbalta. (Tr. 971).

Plaintiff saw Dr. Belfer on March 30, 2016 and was assessed with insomnia and fibromyalgia. (Tr. 970).

Dr. Belfer completed a medical source statement on May 4, 2016. He opined Plaintiff had fibromyalgia, insomnia, depression, and hyperthyroidism, which were all expected to last for a continuous period of one year or longer. Dr. Belfer believed Plaintiff could work two hours, divided, in a day. She could sit

and stand for 15 minutes each at a time. She would need to recline or lie down for 15 minutes every 60 minutes. She could not climb stairs or ladders or stoop. Plaintiff could occasionally reach above her shoulder, operate foot controls, and lift and/or carry up to 10 pounds. Plaintiff could not face exposure to marked changes in temperature or humidity, dust, fumes, gases, machinery, or unprotected heights. She could occasionally drive. She could not push or pull, but could grasp and perform fine manipulations with either hand. Dr. Belfer categorized Plaintiff's pain as severe. He stated she experienced pain hourly, every day, following both activity and rest. Plaintiff was taking Cymbalta, Depakote, Baclofen, and Norco, which caused dizziness and confusion. Plaintiff would be expected to miss work two or more days per month because of pain flare ups and medication side effects. (Tr. 965-69).

## Analysis

Plaintiff argues the ALJ erroneously evaluated the opinions of her treating physicians, Dr. Ray and Dr. Belfer. The Social Security Regulations require an ALJ to afford controlling weight to a treating source's opinion, so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527. Otherwise, the ALJ must identify "good reasons" for rejecting the opinion and assess it against the following factors: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the

supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; and (5) the physician's specialization. *Id.*

Dr. Ray, Plaintiff's neurosurgeon, authored a letter in October 2013, opining Plaintiff had a myriad of limitations following her back surgery. These limitations included no twisting, turning at the waist, lifting more than 10 pounds, driving, or sitting for more than 20 minutes. He stated Plaintiff had to lay down most of the day. Dr. Ray opined Plaintiff's recovery would last three to six months from the time of her surgery (July 2013) and possibly longer. (Tr. 26). The ALJ gave these opinions "limited weight" because they were inconsistent with evidence of Plaintiff's successful recovery after surgery, the letter was "written for an acute period," and Plaintiff wanted to be medically cleared so she could adopt a child. (Tr. 26).

Plaintiff's primary care physician, Dr. Belfer, also authored a medical source statement. He opined, in part, that Plaintiff could work two hours over the course of an eight-hour workday, sit and stand for 15 minutes at a time, and needed to lie down or recline for 15 minutes every hour. The ALJ gave Dr. Belfer's opinions "little weight" because they did not "comport to the evidence of record showing pain relief with her pain management treatment, including physical therapy, medication, and injections." (Tr. 28).

The ALJ failed to evaluate these medical opinions in accordance with the Regulations. As set forth above, an ALJ must first determine whether the treating source's opinion is entitled to controlling weight in consideration of supportability

and consistency with the record. If the ALJ finds the opinion is lacking in either of these aspects, the ALJ must proceed to step two, where he applies the checklist of factors articulated in 20 C.F.R. § 404.1527. The ALJ uses these factors to determine exactly what weight to assign to the opinion. This process consists of two "separate and distinct steps." *Williams v. Berryhill*, 2018 WL 264201, at *3 (N.D. Ill. Jan. 2, 2018). The ALJ, here, conflated these steps. He set forth perfunctory statements that do not indicate he considered the regulatory factors at all. Many of them weigh in favor of assigning the opinions more value. For instance, Dr. Belfer treated Plaintiff for several years and examined her on more than 20 occasions. Dr. Ray specialized in neurosurgery and had an extensive treatment relationship with Plaintiff as well. *See* 20 C.F.R. § 404.1527 (the ALJ must consider the length, nature, and extent of the treatment relationship along with the physician's specialty and the supportability of the opinion).

Nonetheless, the ALJ also failed to provide "good reason" for rejecting the opinions of Dr. Belfer and Dr. Ray. The ALJ discredited Dr. Belfer's opinions because Plaintiff's pain improved from physical therapy, injections, and medications. (Tr. 28). An improvement in symptoms, however, does not necessarily indicate an ability to perform full-time work. *See Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014) ("Simply because one is characterized as 'stable' or 'improving' does not necessarily mean that she is capable of doing light work"). It certainly does not mean Plaintiff had no limitations. Moreover, while Plaintiff did report periods of no pain, these instances were fleeting and cower in

comparison to the times Plaintiff reported pain during the relevant period. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

The ALJ rejected Dr. Ray's opinion because Plaintiff demonstrated a "successful" recovery period following her back surgery, the opinion related to an acute period, and Plaintiff wanted to adopt a child. Plaintiff did report good relief immediately after her back surgery. However, classifying her recovery as "successful" is shaky. In fact, Dr. Ray expressly stated two months after the surgery that although Plaintiff was not in nearly as much pain as she was prior to surgery, she was not at a satisfactory level. (Tr. 776-77). Moreover, Plaintiff continued to consistently complain of pain in her back for years following surgery, she was positive for tender points on her low back throughout the entire record, and she reported that injections in her back provided only temporary relief, at most.

Similarly, Plaintiff's desire to become a mother is not a "good reason" for ignoring Dr. Ray's opinions. Plaintiff told Dr. Ray she thought she was physically capable of caring for a child. However, "taking care of an infant, although demanding, has a degree of flexibility that work in the workplace does not." *Gentle Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005). An ALJ must be cautious not to overlook "the differences between household and labor-market work. . ." *Id.*

In sum, the ALJ committed several errors in evaluating the treating source opinions. Given the amount of mistakes, the Court cannot find that substantial evidence supports the disability determination. Because remand is necessary on this point, alone, the Court will not address Plaintiff's remaining arguments.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for Disability Insurance Benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATE: July 30, 2018.**

<u>**s/ Clifford J. Proud**</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**